1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6
7
8
9
10
11

| RICHARD W. PETERS, | Case No. 3:15-cv-00493-RCJ-WGC |
| Plaintiff, | **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| v. | |
| C/O RAYMOND, et. al., | |
| Defendants. | |

12
13
14

This Report and Recommendation is made to the Honorable Robert C. Jones, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

15
16
17

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 88, 88-1 to 88-9, 90, 94 (errata).) Plaintiff filed a response. (ECF No. 110.) Defendants filed a reply. (ECF No. 115.)

18
19

After a thorough review, it is recommended that the motion be granted in part and denied in part.

20

## I. BACKGROUND

21
22
23
24
25

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 11.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id.*) Defendants are Charles Raymond, Vincent Brooks, Ira Brannon and Isidro Baca.

26
27
28

On screening, the court allowed Plaintiff to proceed with several Eighth Amendment claims. First, the court found Plaintiff stated a colorable Eighth Amendment deliberate indifference claim against Raymond and Brooks. This claim is based on allegations that Raymond and Brooks

1   appointed inmate Norman as one of four inmates to govern and regulate inmates in Plaintiff's unit.

2   (ECF No. 11 at 7.) Plaintiff alleges that these inmates began threatening and assaulting inmates,

3   yet the correctional officers did nothing to address the situation. (*Id*.) Plaintiff was subsequently

4   attacked by Norman. (*Id*. at 8.)

5       Second, the court found Plaintiff stated a colorable Eighth Amendment deliberate

6   indifference claim against Raymond based on allegations that Raymond took steps to incite action

7   against him, including telling a black inmate that Plaintiff was a member of the KKK, singling

8   Plaintiff out for filing grievances, and giving the "shot callers" a green light to beat Plaintiff up.

9   (*Id*. at 10-11.) He avers he has been the target of verbal attacks and threats. (*Id*.)

10      Third, Plaintiff was also allowed to proceed with an Eighth Amendment deliberate

11  indifference claim against a John Doe Lieutenant (subsequently identified as Ira Brannon). This

12  claim is based on allegations that Plaintiff was beaten up by inmate Fernando Rodriguez on May

13  9, 2016. (*Id*. at 14.) Plaintiff told Officer Garvin of the assault, and Garvin took Plaintiff to see

14  Caseworker Moses. (*Id.* at 15.) Plaintiff told Moses that he would defend himself if anyone else

15  attacked him. (*Id*.) Moses contacted Lieutenant Brannon at operations, and Plaintiff alleges that

16  Brannon told Plaintiff that he would fix the problem. (*Id*.) That night, Plaintiff claims that

17  Rodriguez attempted to kill him. (*Id*.) He avers that thereafter Rodriguez remained in his unit and

18  threatened to kill him. (*Id*. at 16.)

19      Finally, the court allowed Plaintiff to proceed with a claim against Baca for injunctive relief

20  based on the allegation that Rodriguez remained in the unit and posed a serious, present risk to his

21  safety. (*Id*.)

22      Defendants now move for summary judgment, arguing: (1) Plaintiff failed to exhaust his

23  administrative remedies; (2) Raymond and Brooks did not know of and disregard a risk that inmate

24  Norman posed to Plaintiff's safety; (3) Officer Raymond did not incite violence against Plaintiff;

25  (4) Brannon did not know of a risk of harm posed by Rodriguez; (5) there was no personal

26  participation by Baca; and (5) they are entitled to qualified immunity.

27  ///

28  ///

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

That being said,

[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*,

477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. Rule 56(d)**

Preliminarily, the court will address Plaintiff's statement in the beginning of his response to the motion for summary judgment that he has not been allowed to collect evidence. Essentially, Plaintiff complains about the fact that he is in isolation without having had a classification hearing (a claim that is not part of this litigation), and that he does not have assistance from a laws clerk or inmate to go through discovery, which makes him "handicapped" in these proceedings.

While the court is sympathetic to Plaintiff's position as being untrained in the law and without the assistance of an inmate law clerk or other inmate assistance, this is not grounds to defer ruling on the motion for summary judgment under Federal Rule of Civil Procedure 56(d).

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."

> Under Fed. R. Civ. P. 56(f) [now 56(d)], a trial court may order a continuance of a motion for summary judgment if the party requesting a continuance submits affidavits showing that, without Rule 56 assistance, it cannot present facts necessary to justify its claims. The requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment. … Failure to comply with these requirements is a proper ground for denying discovery and proceeding to summary judgment.

*Family Home and Finance Center, Inc. v. Federal Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008) (internal quotation marks and citations omitted).

Plaintiff has not set forth what discovery was taken, what facts he believes he could elicit from further discovery, or how they are essential to oppose Defendants' motion. Instead, a

1    review of his response reveals he has been able to present arguments. his version of events, as

2    well as evidence in response to Defendants' arguments. Therefore, to the extent Plaintiff's

3    response can be construed as containing a request to deny or defer the motion under Rule 56(d),

4    that request should be denied.

5    **B. Exhaustion**

6        **1. Standard**

7        The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with

8    respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

9    confined in any jail, prison, or other correctional facility until such administrative remedies as are

10   available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative

11   remedies irrespective of the forms of relief sought and offered through administrative avenues.

12   *Booth v. Churner*, 532 U.S. 731, 741 (2001).

13       The failure to exhaust administrative remedies is "'an affirmative defense the defendant

14   must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v.*

15   *Bock*, 549 U.S. 199, 204, 216 (2007)), *cert. denied*, 135 S.Ct. 403 (Oct. 20, 2014). Unless the

16   failure to exhaust is clear from the face of the complaint, the defense must be raised in a motion

17   for summary judgment. *See id.*, *overruling in part, Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th

18   Cir. 2003) (which stated that failure to exhaust should be raised in an "unenumerated Rule 12(b)

19   motion").

20       "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure

21   to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are

22   disputed, summary judgment should be denied, and the district judge rather than a jury should

23   determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted).

24   "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim. If

25   discovery is appropriate, the district court may in its discretion limit discovery to evidence

26   concerning exhaustion, leaving until later—if it becomes necessary—discovery related to the

27   merits of the suit." *Id.* at 1170 (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). If there

28   are disputed factual questions, they "should be decided at the very beginning of the litigation." *Id.*

at 1171.

Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id*. at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario,* 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did not meet his burden when he failed to identify any actions prison staff took that impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to comply with the administrative remedies process). The ultimate burden of proof, however, remains with the defendant. *Id*.

The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id*. (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis original). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). That being said, an inmate exhausts available administrative remedies "under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process." *Reyes*, 810 F.3d at 658.

To reiterate, an inmate need only exhaust "available" administrative remedies. *See Ross v. Blake*, 136 S.Ct.1850, 1858 (2016). That is, "those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id*. at 1859 (quoting *Booth*, 532 U.S. at 738).

///

- 7 -

**2. Exhaustion at NDOC**

NDOC's grievance process is set forth in AR 740.

AR 740 requires an inmate to complete three grievance levels for exhaustion to be considered complete: the informal, first and second levels. (ECF No. 88-7.) An informal level grievance must be submitted within six months of the wrong alleged. (ECF No. 88-7 at 6.) The failure to submit a proper informal grievance within the time frame constitutes abandonment of the grievance at that, and all subsequent levels. (ECF No. 88-7 at 7) All documentation and factual allegations available to the inmate must be submitted at the informal level. (ECF No. 88-7 at 7.)

**3. Analysis**

Again, Plaintiffs claims are that Raymond and Brooks disregarded the risk that inmate Norman posed to Plaintiff's safety; that Raymond incited violence against Plaintiff; and that Brannon and Baca failed to protect Plaintiff from the risk posed by inmate Rodriguez.

While Defendants originally argued that Plaintiff did not adequately exhaust his administrative remedies with respect to the claims asserted against Raymond and Brooks via grievance 2006-29-94018, they indicated that they were abandoning this argument in a footnote in their reply brief. (ECF No. 115 at 2, n. 1.) The court appreciates Defendants' counsel acknowledging when an argument should be abandoned, but in the future if an argument asserted in summary judgment is going to be abandoned, it should be noted in the substantive portion of the brief, and not in a footnote.

Next, the court will address Defendants' argument that while Grievance 2006-30-24154 references the May 2016 incident involving Rodriguez, the issue was not raised until the first level grievance, and Plaintiff did not complete the grievance through the second level. In their reply brief, Defendants acknowledge that Plaintiff did in fact complete grievance 2006-30-24154 through the second level (ECF No. 115 at 2 n. 1), but they maintain their argument that he did not properly exhaust his administrative remedies because he did not raise the issue until the first level.

In his response, Plaintiff argues that grievances 2006-29-94018 and 2006-3024154 served to exhaust his claims.

1    Plaintiff filed an informal level grievance, assigned grievance number 2006-30-24154,

2    dated May 6, 2016. (ECF No. 110 at 20.) Plaintiff discussed a "shakedown" in his unit on April

3    20, 2016, and his property ending up in disarray, and a folder marked "Raymond" missing some

4    of its contents. (*Id*. at 20-21.) He went on to discuss statements made to him to drop his case

5    against Raymond. (*Id*. at 22.) He stated that his folder had contained affidavits from inmates

6    about harassing conduct by other inmates in the unit, and his contention that these affidavits

7    ended up in the hands of the aggressors, and lead to retaliatory behavior, including assaults and

8    threats. (*Id*. at 22-27.)

9    The informal level grievance was assigned to J. Powers, who responded: "Per AR 740

10   this grievance has been forwarded to the Inspector General office for further review." (ECF No.

11   110 at 28.)

12   Plaintiff submitted a first level grievance dated June 13, 2016. (ECF No. 110 at 29.) He

13   stated that since he filed the initial grievance, On May 6, 2016, Fernando Rodriguez, came after

14   him with his cane. (*Id*. at 29-30.) He described the incident as being instigated by Rodriguez

15   being annoyed by Plaintiff's gas, that he could not control due to a previous gastric bypass

16   procedure. (*Id*. at 30.) Plaintiff went on to state that he tried to explain this to Rodriguez, to no

17   avail. (*Id*.) Later, after the incident, Plaintiff asked Rodriguez if they were okay, and Rodriguez

18   responded, "shut the f. up! Don't talk to me-I have nothing to say to you. Just shut the f. up." (*Id*.

19   at 31.) Plaintiff indicated that Officer Garvin came to talk to him, and Plaintiff said: "If I'm

20   being asked how I got these bruises o my arms and hands-the[y] got caught in the bathroom

21   door, however if anyone else swing[s] anything -be it a fist, cane or whatever- I will defend

22   myself." (*Id*. at 32.) Garvin responded: "The days of running into doors is over-this is the kinder

23   and understanding D.O.C." (*Id*.) He indicated Plaintiff had to make a report. (*Id*.) Garvin took

24   Plaintiff to see Caseworker Moses. (*Id*.) Moses told Plaintiff he would "blow" his Raymond

25   failure to protect case if he did not inform the staff of a problem like this, which convinced

26   Plaintiff to tell her about Rodriguez. (*Id*. at 32-33.)

27   He went on to state that he discussed with her that he and others in the unit had come to

28   her with complaints about problems Rodriguez was causing in the unit, and their concern it

1    would lead to a fight. (*Id*. at 34.) He indicated that Moses had told another inmate raising

2    concerns that Rodriguez was "right where the warden-Baca-wanted him. In that bed, in that

3    dorm. If you have to punch him, do what you have to do." (*Id*.)

4        The grievance went on to describe the incident with Rodriguez, stating that Rodriguez

5    moved Bed F eight to ten inches into Plaintiff's living space (he was in Bed G), and Plaintiff

6    moved it back, telling Rodriguez that it was not up to him to move the bed. (*Id*. at 35.) Rodriguez

7    responded by saying he was going to put on his shoes and then taken Plaintiff out, and proceeded

8    to charge Plaintiff with his cane, hitting Plaintiff five or six times on the arms. (*Id*.) He dropped

9    the cane, and bit Plaintiff through his shirt. (*Id*. at 35-36.)  Plaintiff looked at him and said, "Are

10   you done?" (*Id*. at 36.) Rodriguez let go, and yelled at Plaintiff to stay away from him. (*Id*.)

11       He then stated that Moses emailed the lieutenant (Brannon), and Plaintiff was taken to

12   see him. (*Id*.) Brannon asked him what was going on, and Plaintiff claims he showed him his

13   bruised arms and hands, explained his gas problem, and told Brannon that from that point

14   forward he would defend himself. (*Id*.) He told Brannon what happened. (*Id*. at 37.) He

15   acknowledges that Moses asked him if he felt his life was in danger, and he told her no. (*Id*.)

16   Plaintiff indicated that he did not know of Rodriguez's history of physically assaulting inmates,

17   but Moses did. (*Id*.) He then stated that Rodriguez attached him against at 12:30 a.m. on May 10,

18   2016, with the intent to murder Plaintiff. (*Id*.) He described the remedy sought as removal of

19   these inmates (Bosten, Norman, Ventobal and McClelland from the yard), stating that Raymond

20   had been compromised. (*Id*.)

21       The first level grievance was assigned to I. Baca, who responded: "Mr. Peters, the

22   additional information you have provided will also be forwarded to the Inspector General's

23   Office." (ECF No. 110 at 42.)

24       Plaintiff filed a second level grievance dated August 8, 2016. (ECF No. 110 at 43.) He

25   indicated that no action had been taken, and that Rodriguez had told others he would return to the

26   yard in October, and was heard making statements that he needed to "finish the job," though

27   Plaintiff seemed to acknowledge he did not know if this was referring to him. (*Id*. at 43-44.) He

28   asked for Rodriguez to be moved to Ely or the RMF, and asked for an update on the Inspector

General's Investigation. (*Id.* at 44.)

The second level grievance was assigned to D. Tristan, who responded: "I am in receipt of your informal, Level I and now your level II grievance. You were answered correctly at both the informal and level I portion of the grievance. Your grievance is pending with the Inspector general's Office, as such, this grievance is partially granted in that it was referred to the Inspector General's office for review." (ECF No. 110 at 48.)

The first level grievance clearly describes the incident involving Rodriguez that is the basis of the Eighth Amendment claims against Brannon and Baca in this action, and Plaintiff completed this grievance through the second level.

While AR 740 requires an inmate to include all pertinent facts in the *informal level* grievance, Plaintiff raised the incident with Rodriguez in the first level grievance. Instead of enforcing NDOC's own procedures, Warden Baca responded to the first level grievance indicating that the additional information included in the first level grievance would also be forwarded to the Inspector General for investigation. He did not reject the grievance for containing additional issues, or state that Plaintiff had to file a separate grievance about the Rodriguez incident. In *Reyes v. Smith*, 810 F.3d 654 (9th Cir. 2016), the Ninth Circuit held that an inmate's claim is exhausted when despite the inmate's failure to comply with a procedural rule, the prison official ignores the procedural defect, and the grievance is decided on the merits at all available levels of administrative review. "[W]hen prison officials address the merits of a prisoner's grievance instead of enforcing a procedural bar, the state's interests in administrative exhaustion have been served." *Reyes*, 810 F.3d at 657.

Here, even though the facts surrounding the Rodriguez incident were not raised until the first level grievance, prison officials decided to waive the procedural defect, and rendered a decision on the merits at each available step, even indicating that Plaintiff's grievance had been partially granted insofar as it had been referred to the Inspector General's Office for review. Therefore, Defendants' motion for summary judgment should be denied insofar as it is argued that Plaintiff did not exhaust his administrative remedies with respect to the Eighth Amendment claims asserted against Brannon and Baca.

**C. Eighth Amendment**

The court will now address the arguments pertaining to the merits of Plaintiff's Eighth Amendment claims.

**1. Legal Standard**

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)). "[P]rison officials have a duty … to protect prisoners from violence at the hands of other prisoners." *Id*. at 833 (citations and quotation marks omitted). "Having incarcerated persons [with] demonstrated proclivity[ies] for antisocial, criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id*. (citations and quotation marks omitted). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id*. at 834 (citation and quotation marks omitted).

To succeed on such a claim, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834. First, "the deprivation alleged must be, objectively, sufficiently serious…; a prison official's act or omission must result in the denial of 'the minimal civilized measures of life's necessities.'" *Id*. (citations omitted). When a plaintiff claims prison officials failed to take reasonable steps to protect, the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. (citations omitted). "[T]o satisfy the objective prong, it is enough for the inmate to demonstrate that he was exposed to a substantial risk of some range of serious harms; the harm he actually suffered need not have been the most likely result among this range of outcomes." *Lemire v. Cal. Dep't of Corr. and Rehab*., 726 F.3d 1062, 1076 (9th Cir. 2013)

(citing *Gibson v. Cnty of Washoe, Nev.*, 290 F.3d 1175, 1193 (9th Cir. 2002)). It does not matter whether the prisoner faces a risk "for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

Second, the prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

Prison officials may avoid liability by: (1) proving they were unaware of the risk, or (2) proving they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844-45. A plaintiff "seeking a remedy for unsafe conditions [need not] await a tragic event [such as an] actua[l] assaul[t] before obtaining relief." *Id*. at 845 (citation omitted).

To avoid summary judgment, a plaintiff must show that the alleged deprivation was sufficiently serious, *i.e.*, that he faced a substantial risk of serious harm, and that the defendant's conduct constituted deliberate indifference. *See id.* at 842.

### 2. Raymond & Brooks and the Norman Incident

Defendants acknowledge that there was a physical altercation between Plaintiff and inmate Norman on October 28, 2014. (ECF No. 88-1, Investigation Detail Report.) Officers Raymond and Books were assigned to Unit 2 that morning, and conducted an institutional count at 5:00 a.m., and several checks after that, without occurrence. (Brooks Decl., ECF No. 88-4 ¶¶ 9, 10.) At approximately 6:45 a.m., they were summoned to the culinary to provide coverage for the morning meal. (Raymond Decl., ECF No. 88-3 ¶ 9; Brooks Decl., ECF No. 88-4 ¶ 11.) Later that morning, they state that they learned of the altercation between Plaintiff and Norman. (Raymond Decl., ECF No. 88-3 ¶ 9; Brooks Decl., ECF No. 88-4 ¶ 12.) Raymond requested Plaintiff come to the rotunda and Raymond noticed some abrasions on Plaintiff face, and Plaintiff informed him that he had been in an altercation with Norman. (Raymond Decl., ECF No. 88-3 ¶ 10.) Officer Brooks viewed the video after the fact, and observed Plaintiff peering into Dorm 8 where Norman lived, and when Norman exited his living area, there appeared to be a verbal confrontation between the two that culminated n Norman striking Plaintiff in the face with his plastic coffee cup. (Brooks Decl., ECF No. 88-4 ¶ 13.) At no time did any inmate yell

and request help from staff present in the unit. (Brooks Decl., ECF No. 88-4 ¶ 14.)

Plaintiff and Norman were subsequently secured in handcuffs, and Search and Escort (S&E) officers were dispatched to the unit and escorted both inmates to operations for questioning. (ECF No. 88-1 at 2; Raymond Decl., ECF No. 88-3 ¶ 11; Brooks Decl., ECF No. 88-4 ¶ 15.) Both were interviewed by Caseworker Hannah, and both said there was no remaining tension between them, and that they did not have issues continuing to remain living in the same unit. (Ex ECF No. 88-1 at 2; Brooks Decl., ECF No. 88-4 ¶ 16.)  Raymond and Brooks maintain that prior to the incident, Plaintiff had not told them of any issues, problems, or threats of violence with respect to Norman. (Raymond Decl., ECF No. 88-3 ¶¶ 8, 14; Brooks Decl., ECF No. 88-4 ¶¶ 8, 18.)

Defendants argue that Raymond and Brooks had no prior notice of a risk of harm to Plaintiff. They assert that they did not move "shot callers" into Plaintiff's unit as they have no authority over bed moves. (Raymond Decl., ECF No. 88-3 ¶¶ 5-7, Brooks Decl., ECF No. 88-4 ¶¶ 5-6.) Pursuant to Operational Procedure 570, only institutional caseworkers, shift supervisors and administrators are authorized to submit bed moves requests. (ECF No. 88-9.) In addition, they argue that they had no knowledge that inmate Norman would get into an altercation with Plaintiff.

Plaintiff alleges that the altercation stemmed from a sign printed by Officer Brooks that said not to stand in front of windows and stare into the dorm. Brooks acknowledges that there was a note placed outside the cell stating: "No inmate may stand in front of the windows," but this was done pursuant to the Prison Rape Elimination Act (PREA), due to the fact that this particular inmate living area is more viewable than others, as it contains full glass walls at the entrance of the wing. (Brooks Decl., ECF No. 88-4 ¶ 7.)

In his response, Plaintiff describes the altercation with Norman as commencing when Plaintiff was leaning/standing against a window looking toward the dorms, due to pain in his knee and abdomen, when Norman was returning to the dorm with his coffee, and said to Plaintiff, "You can't stand on your own?" (ECF No. 110 at 5.) Plaintiff replied: "No, I can't." (*Id.*) According to Plaintiff, Norman then grabbed his arm, spilled his coffee on Plaintiff and

1    began hitting Plaintiff in the face with his coffee cup. (*Id*.)

2        Plaintiff indicates that Brooks was alerted after the altercation had took place, and arrived

3    in the unit some time after the altercation with Norman, when Plaintiff was trying to address his

4    injuries. (ECF No. 110 at 4, 5.) As for Raymond, Plaintiff states that he went the rotunda around

5    8:00 a.m., to ask Raymond to take action, and at around 8:45 or 9:00 a.m., Raymond came to the

6    dorm and called Plaintiff and another inmate, Greg Bennett, into the bathroom, where he told

7    Plaintiff to "let it go." (*Id*. at 6.) Then, at about 10:00 a.m., Plaintiff claims that Raymond took

8    him and Norman into the day room and told Norman to apologize to Plaintiff. (*Id*.) Raymond

9    told Plaintiff he had not seen the video yet, and therefore could not write Norman up. (*Id*.) S&E

10   subsequently came and escorted Plaintiff and Norman to operations, where Plaintiff was

11   questioned by Nikki Brooks and Sergeant Miller. (*Id*. at 6-7.) They were released, and Plaintiff

12   went to medical for an evaluation. (*Id*.)

13       Plaintiff states that inmates Blair, Marcelli, and Prichard told him to leave the unit due to

14   a "green light" given by Raymond as to Plaintiff in February of 2015, but this was *after* the

15   incident with Norman. (ECF No. 110 at 7.) He later states that Marcelli told him that a "green

16   light" was given by Raymond on October 28, 2014 at the 5:00 a.m. count. (ECF No. 110 at 11.)

17   This is inadmissible hearsay. In fact, the undated Marcelli affidavit only states that unidentified

18   staff would give a "green light" "on multiple occasions," without identifying a specific date or

19   officer involved. Therefore, this statement is insufficient to raise a genuine dispute of material

20   fact as to whether Raymond was deliberately indifferent to a risk to his safety.

21       In sum, Plaintiff has not produced any evidence to refute that provided by Defendants

22   that Raymond and Brooks did not know of and disregard a risk to Plaintiff's safety in connection

23   with the allegations surrounding the Norman incident. Instead, the evidence in the record

24   indicates that the incident began when Norman asked Plaintiff whether he could stand up, and

25   Plaintiff responded that he could not. There is no evidence connecting this event with conduct on

26   the part of Raymond and Brooks. In fact, the evidence demonstrates that Raymond and Brooks

27   did not become aware of the altercation until after it had occurred.  Therefore, summary

28   judgment should be granted in favor of Raymond and Brooks with respect to this claim.

**3. Raymond- Inciting Violence against Plaintiff**

Plaintiff alleges that in January of 2015, Raymond told a black inmate named "Mike" that he was being housed with the KKK.

Raymond argues that Plaintiff does not allege any assaults or injury as a result of this alleged statement, or otherwise make any connection between alleged threats and this comment. In addition, he argues that even assuming he made the statement, Plaintiff does not allege Raymond had knowledge of a substantial risk of harm as a result of the statement. Finally, Raymond points out that Plaintiff acknowledges he was transferred out of the unit.

In his response, Plaintiff states that he was made a target by Raymond when Raymond "tore up" Dorm 6 on February 9, 2015, demanding that a chair be taken out of the dorm and back to the day room. (ECF No. 110 at 11-12.) He says that Raymond went into the dorm upset, stating that those in the dorm wanted to write kites and grievances about him. (*Id*.) Plaintiff admits he was not present for this event, as he had gone to the infirmary for treatment. (*Id*.) He indicates that inmate Charlie Jackson told him that Raymond informed him Plaintiff was the one filing grievances. Plaintiff states that Raymond spoke to him after that incident, stating that the "shot callers" had done favors for him, and the unit was better with them taking care of problems. (*Id*.)

He then discusses the statement he alleges Raymond made to a black inmate, that the inmate was living with the KKK. (ECF No. 110 at 12.) That statement was made in January of 2015. (*Id*.) Plaintiff characterizes the statement as a "direct jab to the dorm members" and the reason Plaintiff finally started a grievance. (*Id*.) Plaintiff initiated the grievance on January 16, 2015. (ECF No. 88-8 at 2.) He said: "On 1-12-15 C/O Raymond came through for count in Dorm-6-c-wing and told "Mike", in Bed-C- (A Black Gentleman!) to stand-up so he could see his face 'You are in here with the K.K.K.'" (ECF No. 88-8 at 2.) He went on to state that this made every inmate in the dorm a target. (*Id*. at 3.)

In his first level grievance, dated February 17, 2015, he stated that since filing the informal level grievance, he had been "verbally attacked" on three occasions by black inmates. (ECF No. 88-8 at 6; *see also* ECF No. 110 at 12.) The first instance was on January 30, 2015,

over a chair that he conceded not to sit in, where the inmate called Plaintiff a "rac[ist] bitch." (ECF No. 88-8 at 6.) The second was from the "shot caller," yelling at Plaintiff for having his arm over the edge of a microwave door in the day room. (ECF No. 110 at 68; ECF No. 88-8 at 7.) The third, was on February 12, 2015, when "shot callers" came into the dorm and told him to stop asking questions about what they do. (*Id*.)

Plaintiff claims that he was warned by inmates to get out of Unit 2 for his own safety. (ECF No. 111 at 12; ECF No. 88-8 at 8.)

Baca responded to the first level grievance, stating that the informal grievance and the details asserted in the first level grievance, had been forwarded to the Inspector General for investigation. (ECF No. 88-8 at 10.) Baca also noted that Plaintiff was moved to another unit while the issue was being investigated. (*Id*.) In his second level grievance, Plaintiff responded that moving him out of the unit "did take [him] out of the equation." (*Id*. at 11.)

Plaintiff provides an undated affidavit of Anthony Marcelli, that states that he was placed in the dorm in Unit 2, and there were inmates that continuously threatened and assaulted other inmates in the unit. (ECF No. 110 at 96.) Marcelli stated that they would "compromise staff" and staff would give them a "green light," without identifying any particular staff or describing the specific action taken. (*Id*.)

Preliminarily, the court points out that Raymond does not address whether he made the alleged statement in his declaration, but Plaintiff maintains that he said it and reported it as being made in his grievance. The issue is whether this alleged statement subjected Plaintiff to a substantial risk of serious harm.

Raymond asserts that Plaintiff does not connect the statement to any act of violence. Plaintiff says generally that this statement made every inmate in the unit a target, but provides no details that would allow the court to infer that this single statement, that did not reference Plaintiff or any particular inmate in the unit, posed a substantial risk of serious harm. Plaintiff points to three incidents: being confronted about sitting in a particular chair, an inmate yelling at him for having his arm over the edge of a microwave door, and inmates telling him to stop asking questions about what they do. These events, which are described with minimal factual

1    detail, do not paint a picture of an inmate exposed to a substantial risk of harm as a result of the

2    alleged comment. Moreover, Plaintiff was subsequently moved from the unit while his

3    complaints were being investigated. Finally, there is no evidence that this statement attributed to

4    Raymond had any connection to the subsequent attacks involving Rodriguez, as Plaintiff admits

5    those stemmed from a dispute about bed placement and Plaintiff's gas issues.

6         Plaintiff has not presented a genuine dispute of material fact as to whether he was subject

7    to a substantial risk of harm as a result of Raymond's alleged comment. That is not to say that

8    the court condones making such a statement (if it was in fact made), or that such a statement

9    could not pose a substantial risk of harm under certain circumstances; but, here the record is

10   devoid of evidence to that effect. There is no information about the context in which the

11   statement was made, race relations in the unit before the statement, Plaintiff's interaction with

12   inmates of other races before the incident, or any specific information from which to infer that

13   the statement subjected Plaintiff to a substantial risk of harm. Plaintiff's sparse description of the

14   interactions with black inmates that follow appear more like typical disagreements among

15   inmates in the same unit, and not situations that presented a substantial risk of harm. Also, when

16   Plaintiff alerted prison officials to the statement and what he described as harassing conduct by

17   the inmates, he was moved out of the unit.

18        Therefore, summary judgment should be granted in Raymond's favor with respect to this

19   claim.

20   **4. Brannon & the Rodriguez Incidents**

21        According to Brannon, on May 9, 2016, he received a phone call from Correctional

22   Caseworker Specialist Michelle Moses stating that she was sending Plaintiff to operations to

23   speak with him about having issues with his assigned housing location. (Brannon Decl., ECF No.

24   88-6 ¶ 4.) Plaintiff claimed he had gotten into an argument with Fernando Rodriguez about living

25   space within the dorm area, and that Rodriguez placed his hands on Plaintiff over the dispute.

26   (Brannon Decl., ECF No. 88-6 ¶ 5.) Brannon did not observe any visible marks or injuries that

27   would be consistent with a physical altercation. (Brannon Decl., ECF No. 88-6 ¶ 6.)

28        Brannon claims that he then asked Plaintiff if he felt like his life was in danger, and if he

1  wanted to go into protective segregation. (Brannon Decl., ECF No. 88-6 ¶ 7.) Plaintiff was

2  adamant that he did not want to go into protective segregation, and instead preferred a bed move

3  from his current housing assignment. (Brannon Decl., ECF No. 88-6 ¶ 9.) Brannon told Plaintiff

4  the only bed move he was authorized to make was to administrative or protective segregation,

5  and if he wanted a bed move it would need to be obtained through the caseworker. (Brannon

6  Decl., ECF No. 88-6 ¶ 9.) Plaintiff did not state he was in fear for his safety or that he believed

7  he needed to be separated from the inmate. (Brannon Decl., ECF No. 88-6 ¶ 10.) He said he was

8  fine, and was adamant about not going into protective segregation. (Brannon Decl., ECF No. 88-

9  6 ¶ 10.)

10       Brannon argues that he is not liable because Plaintiff refused to go into protective

11  segregation and denied being at risk.

12       In his response, Plaintiff states that the issues with Rodriguez began with complaints

13  about Plaintiff's gas problem. (ECF No. 110 at 8.) Plaintiff explains that he had gastric bypass

14  surgery in 1996, and has suffered from digestive problems and gas issues since. (*Id*.) After the

15  incident with Rodriguez on May 9, 2016, Plaintiff spoke to Officer Garvin, and Plaintiff said he

16  was not making a complaint, and if anyone asked, he got his arm caught in the door with his

17  wheelchair. (*Id*.) He assured Garvin, however, that if he ever was attacked again, he would

18  defend himself. (*Id*.) Garvin responded that "the days of walking into doors are over-this is a

19  kinder DOC. Bruises need to be explained." (*Id*.) Plaintiff then told Garvin about Rodriguez

20  moving his bed into Plaintiff's living space, and Plaintiff moving the bed back, which resulted in

21  Rodriguez hitting Plaintiff with his cane. (*Id*.) Garvin took Plaintiff to see Caseworker Moses,

22  and Plaintiff reiterated that he would defend himself in the future. (*Id*.)

23       Plaintiff went on to tell Moses what had occurred with Rodriguez. (*Id*. at 8-9.) Moses had

24  Plaintiff go to Operations to talk to Lieutenant Brannon. (*Id*.) Plaintiff claims that he reiterated to

25  Brannon that he would defend himself in the future if necessary. (*Id*.) Plaintiff claims that

26  Brannon told him to go back to the unit, and that he would talk to Rodriguez and fix the problem.

27  (*Id*.) He disputes that Brannon asked him about going to administrative or protective segregation.

28  (*Id*.) He does acknowledge, however, that Moses had asked him if he felt his life was in danger,

and he said, "no." (*Id*.) He explained: "Due to how things usually go once a blowup happens it is usually over." (*Id*.) Plaintiff argues that Brannon and Moses both had access to Rodriguez's history. (*Id*.) Plaintiff claims that he showed Brannon the bruises on his arms and hands from the May 9, 2016 attack by Rodriguez, but Brannon took no action to move him. (*Id*. at 14.) Then, that night at 12:00 a.m., Plaintiff asserts that Rodriguez tried to kill him. (*Id*.)

The unusual occurrence report from the May 10, 2016 incident indicates that Plaintiff reported that Rodriguez started hitting him with the metal foot rest from a wheelchair while he was sleeping. (ECF No. 90-1.) He indicated that the fight had started earlier in the day, when Rodriguez had hit Plaintiff with his cane in the abdomen. (*Id*.) The objective portion of the form indicates he had a one-inch laceration at the right outer eyebrow, a large gouge on the top left side of the scalp, a cheek laceration, a small cut to the left shoulder, a bite mark at the upper, mid-abdomen, and several lumps on the head. (*Id*.) He was assessed as having head wounds requiring sutures, and was sent to the emergency room. (*Id*.)

Taking the facts in the light most favorable to Plaintiff, he was attacked by Rodriguez on May 9, 2016; he spoke to Caseworker Moses, and when she asked him if he felt his life was in danger, he said no; he thought that "once a blowup happens it is usually over;" he spoke to Brannon, and showed him the bruises on his arms, and Brannon told Plaintiff that he would speak to Rodriguez; Brannon did not ask him if he feared for his life; Plaintiff did not request a bed move and nothing was said about a move to protective segregation; Plaintiff was sent back to his unit, and then was attacked by Rodriguez again shortly after midnight on May 10, 2016. While Plaintiff suggests that Moses and Brannon had access to Rodriguez's history, he provides no evidence of what was in Rodriguez's history or evidence of any knowledge of such history on the part of Moses or Rodriguez.

Plaintiff acknowledges that he told Moses he did not fear for his life. There is a dispute as to whether Plaintiff told this to Brannon, and Brannon does not state whether Moses conveyed this information to him. There is also a dispute as to whether Brannon saw bruises on Plaintiff from the first incident with Rodriguez, though Brannon acknowledges that Plaintiff claimed Rodriguez had put his hands on Plaintiff over the dispute about their living space. (Brannon

1  Decl., ECF No. 88-6 ¶ 5.) Finally, there is a dispute as to whether Brannon offered a protective

2  or segregated housing move to Plaintiff, told Plaintiff he would speak to Rodriguez, or did

3  nothing and returned Plaintiff to the unit. Therefore, there is a genuine dispute of material fact as

4  to whether Brannon was deliberately indifferent to Plaintiff's safety when Plaintiff was returned

5  to his unit after the initial incident with Rodriguez and was subsequently attacked. A fact finder

6  believing Plaintiff's version of events could conclude that Brannon knew Plaintiff faced a

7  substantial risk of serious harm being housed with Rodriguez; that Brannon failed to take any

8  action; and, Plaintiff was attacked by Rodriguez again later that night. As such, summary

9  judgment should be denied as to Brannon.

10  Brannon is not entitled to qualified immunity at this juncture. There is a factual question

11  as to whether Brannon violated Plaintiff's rights, and the law was clearly established at the time

12  that a prison official could not knowingly disregard a substantial risk to an inmate's safety.

13  **5. Baca**

14  Baca is correct that the court only allowed Plaintiff to proceed with an injunctive relief

15  claim against him based on the allegation that Rodriguez continued to pose a threat against him.

16  He argues that this cannot be the case because Plaintiff has been transferred to High Desert State

17  Prison. In addition, he states there is no allegation that Baca had any personal involvement in the

18  alleged constitutional violation.

19  To grant injunctive relief concerning serious risks to an inmate's safety, the court must

20  find at the time the relief will be granted, that there is still a serious, present risk to the inmate,

21  and that prison officials are still acting with deliberate indifference to that risk. *See Farmer*, 511

22  U.S. at 845-47; *see also Helling v. McKinney*, 509 U.S. 25, 35-36 (1993). The court cannot

23  conclude there is still a risk to the inmate since Plaintiff has been transferred out of that facility,

24  and there is no evidence of any continuing deliberate indifference.

25  Nor is there any independent evidence of deliberate indifference by Baca personally.

26  Baca's only involvement appears to have been in responding to Plaintiff's first level grievance

27  after both the May 9 and 10, 2016 attacks. (ECF No. 110 at 42.) Baca indicated that he would

28  provide the information set forth in the grievance, including the details about the attacks, to the

1    Inspector General, who was conducting an investigation. (*Id.*)

2          Therefore, summary judgment should be granted in Baca's favor.

3                              **IV. RECOMMENDATION**

4          IT IS HEREBY RECOMMENDED that the District Judge enter an order:

5          (1) **DENYING** summary judgment on the basis that Plaintiff failed to exhaust his

6    administrative remedies;

7          (2) **GRANTING** summary judgment in favor of defendants Brooks, Raymond and Baca,

8    but **DENYING** summary judgment as to defendant Brannon.

9          The parties should be aware of the following:

10          1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

11    this Report and Recommendation within fourteen days of receipt. These objections should be titled

12    "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by

13    points and authorities for consideration by the district judge.

14          2. That this Report and Recommendation is not an appealable order and that any notice of

15    appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

16    until entry of judgment by the district court.

17

18    DATED: October 1, 2018

19                                          _____
                                            WILLIAM G. COBB
20                                          UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28